## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **SUSAN DRAZEN, o**n *behalf of herself and others similarly situated* | ) ) | |
| **Plaintiffs,** | ) ) | |
| **vs.** | ) ) | **CIVIL ACTION: 1:19-00563-KD-B** |
| **GODADDY.COM, LLC,** | ) ) | |
| **Defendant.** | ) | |
| | | |
| **JASON BENNETT, o**n *behalf of himself and others similarly situated* | ) ) | |
| **Plaintiffs,** | ) ) | |
| **vs.** | ) ) | **CIVIL ACTION: 1:19-00563-KD-B** |
| **GODADDY.COM, LLC,** | ) ) | |
| **Defendant.** | ) | |

## FINAL JUDGMENT AND ORDER APPROVING CLASS SETTLEMENT

This matter is before the Court on Plaintiffs' Motion for Final Approval of Class Action Settlement and Memorandum in Support (Doc. 69), supporting exhibits (Docs. 69-1, 69-2, 69-3), and Plaintiffs' motion for Attorneys' Fees, Costs, Expenses, and Service Awards. (Doc. 50). Also before the Court is Objector Juan Pinto's Objection to Settlement and Amount of Attorneys' Fees (Doc. 53); Plaintiffs' Response to Pinto's Objection (Doc. 61); Defendant GoDaddy.com, LLC's Notice of Partial Joinder of Plaintiffs' Response (Doc. 62); and Pinto's Reply (Doc. 63).

Upon consideration of the Motions, briefs, supporting evidentiary submissions, the parties' and objector's respective positions at the evidentiary hearing held December 14, 2020, and for the reasons set forth herein, the Plaintiffs' Motion for Final Approval of the Settlement Agreement is **GRANTED**. Plaintiffs' Motion for attorneys' fees, costs, and expenses is **GRANTED in part** and

1

**DENIED in part**. Class member Pinto's objections are overruled, except to the extent the Court has reconsidered attorney fees. Accordingly, the Court enters this Final Judgment and Order Approving Class Settlement.

## I.    Background

On January 10, 2020, Plaintiff Susan Drazen file an unopposed motion for Preliminary Approval of Class Action Settlement. (Doc. 20). Thereafter, on February 19, 2020, this Court accepted transfer of the Bennett Matter from the District of Arizona. (Case No. 2:16-cv-3908 (D. Ariz. 2016)). On February 21, 2020, the Court consolidated the Bennett Matter with Drazen v. GoDaddy.com, LLC, Civil Action No. 19-00563-KD-B (S.D. Ala. 2019). (Doc. 29). A third related action, Herrick v. GoDaddy.com, LLC, (No. 2:16-cv-00254 (D. Ariz. 2016), *appeal pending* 18-16048 (9th Cir. 2018)) "is incorporated into and resolved by the Parties' settlement." (Doc. 39 at 2, n.1).

Plaintiffs[1] bring this class action complaint alleging Defendant GoDaddy.com, LLC (GoDaddy) violated the Telephone Consumer Protection Act of 1991 (TCPA), 47 U.S.C. § 227. Specifically, Plaintiffs allege GoDaddy violated the Act by sending text messages and placing phone calls to Plaintiffs' cellular telephones, marketing its products and services. Plaintiffs alleged these calls and text messages were placed/sent using an "automatic telephone dialing system" (ATDS), as defined by 47 U.S.C. § 227(a)(1) and prohibited by 47 U.S.C. § 227(b)(1)(A). Additionally, Plaintiffs contend GoDaddy's contacts were not made for emergency purposes; Plaintiffs allege the contacts were made using an autodialing system that did not require human

---

[1] The parties refer to "Plaintiffs" throughout their filings in reference to Susan Drazen, Jason Bennett, and John Herrick collectively. See e.g., (Doc. 69-1 at 2). John Herrick is not a named plaintiff; he is also not a named representative. (Doc. 44 at 8 (discussing why Herrick could not be a named representative); Doc. 49 (indicating John Herrick's removal as a named representative)).

intervention. And, Plaintiffs allege GoDaddy did not have their prior express written consent to place the phone calls or to send the text messages.

The TCPA makes it unlawful "to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using an automatic telephone dialing system or an artificial or prerecorded voice" "to any telephone number assigned to a paging service, cellular telephone service…" 47 U.S.C. §§ 227(b)(1)(A), 227(b)(1)(A)(iii).

On February 6, 2020, the Court held a hearing on Plaintiffs unopposed motion for preliminary approval. (Doc. 20). At the hearing, the Court requested the parties submit a modified class definition because the proposed class definition appeared to be over-inclusive. Then, on February 21, 2020, the Court *sua sponte* ordered the parties to file briefs explaining how this case was distinguishable from Salcedo v. Hanna, 936 F.3d 1162, 1172 (11th Cir. 2019) (holding recipients of a single text have not suffered an injury in fact and do not have standing to sue under the TCPA) and for clarification regarding whether the proposed class definition encompassed individuals who received a single text message. (Doc. 30). The parties also filed responsive briefs regarding the impact of Salcedo v. Hanna, 936 F.3d 1162, 1172 (11th Cir. 2019) on this case. On April 27, 2020, the parties filed a joint statement modifying the class definition in the amended class action settlement agreement in accordance with the Court's direction at the February 6, 2020 hearing. (Doc. 41 at 3).

The modified class definition amended the parties Motion for Preliminary Approval of Class Action Settlement and Certification of the Settlement Class (Doc. 20). The modified definition provided:

(a) All persons within the United States to whom, from November 4, 2014 through December 31, 2016, Defendant placed a voice or text message call to their cellular telephone pursuant to an outbound campaign facilitated by the web-

based software application used by 3Seventy, Inc., or the software programs and platforms that comprise the Cisco Unified Communications Manager.

(b) Excluded from the term "Settlement Class" are (1) the trial judges presiding over the Actions; (2) Defendant, as well as any parent, subsidiary, affiliate or control person of Defendant, and the officers, directors, agents, servants or employees of Defendant; (3) the immediate family of any such person(s); (4) any Settlement Class Member who timely and properly opts out of the settlement; and (5) Class Counsel, their employees, and their immediate family.

(Doc. 41 at 4). And see (Doc. 45-1 at 11 (incorporating the amended definition into the operative Settlement Agreement)). The "Class Period" is defined as "the period from November 4, 2014 through December 31, 2016." (Doc. 20-1 at 6).

Among other terms and conditions, the parties agreed to a creation of a Settlement Fund of $35,000,000.00 for payment of the Administrative Expenses ("reasonable costs and expenses associated with the Settlement Administrator"), attorney's fees not to exceed 30% of the Total Settlement amount plus costs and expenses, service awards for each Plaintiff in the amount of $5,000 each, and the Settlement Class Members choice of either a Cash Award ($35) or a Voucher award ($150). (Doc. 45-1). The parties also agreed that should the total dollar amount of Approved Claims plus Settlement Costs exceed the Total Settlement amount, each individual Settlement Award to the Class Members would be subject to a *pro rata* reduction. (Id. at 24).

Upon consideration of the parties briefs, relevant law, and the parties positions at the hearing on the Motion for Preliminary Approval, the Court granted the Motion to preliminarily certify the Settlement Class, conditioned on the parties submitting an amended settlement agreement removing John Herrick as a Class Representative in light of Salcedo v. Hanna, 936 F.3d 1162, 1172 (11th Cir. 2019). (Doc. 44). In response, the Plaintiffs submitted a Second Amended Class Action Settlement Agreement (Settlement Agreement) removing John Herrick as a Class Representative. The Court then preliminarily approved the Settlement Agreement. (Doc. 49). The

Court also designated JRC Legal, McGuire Law, P.C., Underwood and Riemer, PC, Bock, Hatch, Lewis & Oppenheim, LLC, Mark K. Wasvary, P.C., Kent Law Offices, and McMorrow Law, P.C., as Class Counsel. (Doc. 49 at 3). The Court granted the parties unopposed motion to mutually select and supervise the Settlement Administrator. (Id. at 4). The Court designated Susan Drazen and Jason Bennett as Class Representatives. (Id. at 3).

Pursuant to the Court's order, GoDaddy provided a list containing name and address information for Class Members to the Settlement Administrator as set forth in the Declaration of Kari Grabowski (Grabowski), Project Manager for the Settlement Administrator Epiq Class Action & Claims Solutions (Epiq). (Doc. 69-3 at 1, 5). Notice was provided as discussed herein in Section IV. As of October 22, 2020, Epiq received 11 timely opt-out requests, two objections,[2] and 24,059 claims. (Id. at 10).

On December 14, 2020, the Court held the Final Approval Hearing and heard the parties' positions on the Plaintiffs' Motion for Final Approval of the Settlement Agreement and Final Certification of the Settlement Class (Doc. 69), Class Counsel's Motion for Attorneys' Fees, Costs and Expenses (Doc. 50), and Objector Juan Pinto's Objection. (Doc. 53). The Plaintiffs and GoDaddy represented that the Settlement Agreement was fair, reasonable, and due to be approved. The Plaintiffs similarly argued their motion for attorneys' fees, expenses and costs were reasonable and due to be approved.

Objector Pinto, appearing through counsel, reiterated his arguments set forth in his objection (Doc. 53). He argued in part that this is a coupon settlement under the Class Action Fairness Act and that the requested attorneys' fees are too high and disproportionately benefit

---

[2] Only one objection was timely and proper. See (Doc. 71 (striking Steven F. Helfand's objection)).

Class Counsel instead of the Class.  Pinto asked that the settlement either be amended to assuage his expressed concerns, or in the alternative be disapproved.

## II.    **Premature Order on Fees**

At the outset, the Court acknowledges its order granting in part and denying in part Plaintiffs' request for attorneys' fees was premature, as it preceded the objection deadline of August 31, 2020. (Doc. 51). The Court subsequently entered an order September 1, 2020, amending its premature order, carrying the Plaintiffs' motion to the Final Approval Hearing. (Doc. 55).  Accordingly, the Court reconsiders Plaintiffs' motion for attorneys' fees and costs. And while Pinto (the objector) argues that other class members likely felt it would be futile to object to the attorney fees due to the Court's order, the Court believes that such objections have been adequately voiced by Pinto.

Moreover, complete review of the settlement and attorney fees is warranted in that the landscape for TCPA cases is constantly shifting. Since arriving at this Settlement Agreement several cases have been decided in the Eleventh Circuit impacting the viability of TCPA cases and changing settlement positions for both parties in this case. See e.g., Grigorian v. FCA US LLC, 2020 WL 7238392 (11th Cir. Dec. 9, 2020) (finding that a recipient of a single prerecorded voicemail message on her cell phone did not allege a concrete injury and did not have standing to sue under the TCPA.); Id. at *3 (noting that Salcedo "leaves unaddressed whether a plaintiff who alleged that he had received multiple unwanted and unsolicited text messages may have standing to sue under the TCPA"); Johnson v. NPAS Solutions, LLC, 975 F.3d 1244 (11th Cir. 2020)(holding that incentive awards in class actions are not allowed).

## III.    **Applicability of Class Action Fairness Act's Coupon Settlement Provisions**

Objector Pinto argues this Settlement Agreement is a "coupon settlement" under the Class Action Fairness Act (CAFA). If this is correct, such impacts the standard of review the Court employs. (Doc. 53 at 20). Pinto also contends the application of CAFA's coupon settlement provisions changes the method through which the Court should analyzes the award of attorneys' fees. (Id. at 24).

Pinto correctly points out that the "Eleventh Circuit has yet to weigh in on what it deems a coupon" and "coupon" is also not defined by CAFA. (Id. at 20). Nevertheless, Pinto stresses this Settlement Agreement falls within the parameters of coupon settlements under CAFA, citing out of circuit and/or otherwise distinguishable cases in support.

The Court has considered Pinto's objections, both those expressed in his written objection, as well as his arguments advanced at the Final Approval Hearing. The Court disagrees with Pinto; this is not a coupon settlement as contemplated by CAFA. Notably, Class Members received the choice between a $150 Voucher *or* a $35 cash award. The $150 Voucher award in and of itself may be a coupon as anticipated by CAFA, but, the presence of the $35 cash award removes this Settlement Agreement from the purview of CAFA's restrictions on coupon settlements. Mahoney v. TT of Pine Ridge, Inc., 2017 WL 9472860, at *6 (S.D. Fla. Nov. 20, 2017)(finding that an option between cash and nonpecuniary relief is not a coupon settlement). Here, the Class Members had the opportunity to weigh, in their own rationale self-interest, whether the $150 Voucher award provided greater value than the $35 cash award. Thus, unlike a coupon only settlement where there is no cash alternative, for those who elect a voucher the likelihood that the voucher would be used is significantly greater.  Also, the Court notes that roughly half of the Class Members who claimed awards opted for the $150 Voucher option. Thus, it can be assumed that half of the claimants recognized the $150 Voucher as bestowing equal or greater value than the $35 cash award.

Compare with In re: Lumber Liquidators Chinese-Manufactured Flooring, 952 F.3d 471, 490-91 (4th Cir. 2020) (finding if more class members choose cash, the class members are necessarily recognizing the limited purchasing power of the voucher compared to the cash). Accordingly, the Court finds that the presence of the cash award option removes this Settlement Agreement from the strictures of 28 U.S.C.A. § 1712 ("If a proposed settlement in a class action provides for a recovery of coupons to a class member, the portion of any attorney's fee award to class counsel that is attributable to the award of the coupons shall be based on the value to class members of the coupons that are redeemed.").

## IV.    Notice to the Class and the Claims Procedure

In the Order granting preliminary approval, the Court found that the forms of class notice proposed by the parties would provide reasonable, adequate and sufficient notice to the Class Members and it met the requirements of due process. (Doc. 49 at 4-7). The Court similarly found the proposed Notice Plan for distribution to Class Members was reasonably calculated to provide notice to all Class Members who were identified by GoDaddy; the Court found the Notice Plan was the best notice practicable under the circumstances. (Id.).

Before the Final Approval Hearing, the Plaintiffs submitted their motion for final approval which included the Declaration of Kari Grabowski Regarding Notice and Settlement Administration, the Project Manager for Epiq. (Doc. 69-3). Grabowski's declaration outlined the steps taken to comply with the Court-approved Notice Plan. (Id. at 3 (noting compliance); Doc. 49 (referencing Doc. 45-1 which was adopted as the operative settlement agreement which contains the Notice Plan)). According to the Declaration, after receipt of the Class Members' information from GoDaddy, Epiq analyzed the list and removed exact duplicate records. (Doc. 69-3 at 5). This resulted in a total of 1,188,538 potentially valid email addresses from the list of 1,189,328 records.

(Id.). Epiq thereafter received supplemental information for Settlement Class Members which resulted in a final list of 1,237,296 Settlement Class Members. (Id.). On July 9, 2020, Epiq sent Email Notice to 1,118,538 potentially valid email addresses from the initial class list; on August 7, 2020, Epiq sent Email Notice to 49,585 potentially valid email addresses from the supplemental class list. (Id. at 6).[3] Ultimately, Epiq delivered email notice to over 81.5% of the email addresses provided. (Id.). Epiq also mailed Postcard Notice to 82 persons who requested such notices. As of October 22, 2020, Epiq has sent 1,465,841 Notices by either mail or email to Settlement Class members; notices to 37,775 unique Settlement Class Members currently are known to be undeliverable. (Id.).[4] In addition, Epiq launched and maintained a settlement-specific website where "Settlement Class Members could visit to obtain additional information about the settlement as well as important documents, including the Long Form Notice, Settlement Agreement, Claim Form, and Order…" (Id. at 8). A toll-free number was also listed on the Settlement Website to be used by Settlement Class Members to obtain further information regarding the Settlement. (Id. at 9).

The Short Form Notice includes a detailed description of the proceedings in a manner that would be reasonably understood by the average person. (Doc. 45-1 at 47). It contained a summary of the class action settlement and directed the recipients to the website or to the Settlement Administrator's address for the recipient to send its claim by the requisite date. (Id.). The notice contains a section captioned "What Are My Options" which gave information about how to be bound by the settlement as well as what the recipient could do to opt out of the settlement. (Id. at

---

[3] A total of 228,582 emails bounced back or were undeliverable. (Doc. 69-3 at 6). Epiq mailed 227,636 Postcard Notices to Settlement Class Members with valid mailing addresses for whom email addresses were not available or were undeliverable. (Id. at 7). Before mailing Postcard Notices, Epiq checked all mailing addresses against the National Change of Address database maintained by the USPS. Addresses were also verified through two other systems to ensure accurate addresses. (Id.).

[4] Notice was effective for 96.95% of the Class ((1,237,296-37,775)/1,237,296).

48). It directed the recipient to the settlement website for a more detailed explanation of how to be excluded from or how to object to the Settlement. (Id. at 48). Additionally, the notice informed the recipient of her right to appear at the hearing on attorney's fees and tells the recipients she can call a number or visit the website for further information. (Id.). The Long Form Notice provided a lengthier description of the lawsuit, of the settlement, and of the rights of potential class members. It provided the date of the Final Approval Hearing and explained class members were entitled to appear. The Settlement Website presents clear information regarding the Settlement Agreement, highlighting important dates and providing easily accessible links to pertinent documents. See www.DrazenTCPASettlement.com.

As of October 22, 2020, the Settlement Website had been visited by 67,392 unique visitors and 255,525 website pages have been viewed. (Doc. 69-3 at 8). As of October 22, 2020, the toll-free number had received 730 calls. (Id. at 9). Also as of October 22, 2020, Epiq had received 24,059 completed claims consisting of 11,662 claims for Cash Awards and 12,396 Voucher Awards (approximately 2% claim rate). (Id. at 10).[5]

Before final approval of a class settlement, "[t]he court must direct notice in a reasonable manner to all class members who would be bound by the" proposed class settlement. Fed. R. Civ. P. 23(e)(1). The Court has now received Grabowski's Declaration regarding actual notice, the copies of notices attached to Grabowski's Declaration, the Declaration from Stephanie Fiereck on the Implementation of CAFA Notice (Legal Notice Manager for Epiq) and heard from counsel and Pinto at the Final Approval Hearing. The Court finds that the Notice and the claims procedures

---

[5] Epiq indicates it is still reviewing, receiving and processing timely and late claims so these totals are preliminary at this juncture. (Doc. 69-3 at 10, n.3).

actually implemented satisfy due process, meet the requirements of Rule 23(e)(1), and the Notice constitutes the best notice practicable under the circumstances.[6]

## V.   **Certification of the Class Action**

"'For a class action to be certified, the named plaintiff must have standing, and the putative class must satisfy both the requirements of Federal Rule of Civil Procedure 23(a), and the requirements found in one of the subsections of Rule 23(b).'" Cordoba v. DIRECTV, LLC, 942 F.3d 1259, 1267 (11th Cir. 2019) (citing City of Hialeah v. Rojas, 311 F.3d 1096, 1101 (11th Cir. 2002)). The Rule 23(a) requirements for certification of any class action are: "(1) numerosity ('a class [so large] that joinder of all members is impracticable'); (2) commonality ('questions of law or fact common to the class'); (3) typicality (named parties' claims or defenses "are typical… of the class"'; and (4) adequacy of representation (representatives 'will fairly and adequately protect the interests of the class')." Amchem Products, Inc. v. Windsor, 521 U.S. 591, 613 (1997); Vega v. T-Mobile USA, Inc., 564 F.3d at 1268 (same); Valley Drug Co. v. Geneva Pharms., Inc., 350 F.3d 1181, 1187-88 (11th Cir. 2003) (same).

"In addition to establishing the requirements of Rule 23(a), a plaintiff seeking class certification must also establish that the proposed class satisfies at least one of the three requirements listed in Rule 23(b)." Little v. T–Mobile USA, Inc., 691 F.3d 1302, 1304 (11th Cir. 2012). In this case, the plaintiffs are pursuing certification under the third alternative requirement, Rule 23(b)(3). Rule 23(b)(3) permits class certification if "the court finds that the questions of law or fact common to class members *predominate* over any questions affecting only individual

---

[6] Now that notice has been effectuated, and with the low claims rate of 2% to consider, the Court questions whether requiring claims to be filed is the most advantageous settlement for consumers with meritorious claims.  In a situation such as this where the defendant knows the entire list of potential claimants, perhaps it would be better to avoid the claims process and work directly with claimants to compensate those individuals that do not choose to opt out.  Such a process would be advisable when the merits of the claim are less of an issue.

members, and that a class action is *superior* to other available methods for fairly and efficiently adjudicating the controversy." Fed.R.Civ.P. 23(b)(3) (emphasis added)

Moreover, "[b]efore a district court may grant a motion for class certification, a plaintiff seeking to represent a proposed class must establish that the proposed class is "adequately defined and clearly ascertainable." Little, 691 F.3d at 1304 (citing DeBremaecker v. Short, 433 F.2d 733, 734 (5th Cir. 1970) and John v. Nat'l Sec. Fire & Cas. Co., 501 F.3d 443, 445 (5th Cir. 2007)). The Eleventh Circuit requires that "the class definition contains objective criteria that allow for class members to be identified in an administratively feasible way." Id.

Here, the Settlement Class Members were readily ascertainable based on the information GoDaddy provided in the "Cellular Number List and Contact Information Records." See (Doc. 45-1 at 6-7). The Settlement Administrator was able to utilize this information to identify Settlement Class Members. (Doc. 69-3 at 5). And, GoDaddy supplemented this list which the Settlement Administrator then incorporated into its Notice process (Id.). The list of Settlement Class Members with contact information allowed Settlement Class Members to be identified in an "administratively feasible way." Karhu, 621 Fed.Appx. at 946. Therefore, the Court finds that the ascertainability requirement is met.

As to the remaining requirements for certification, the Court adopts and incorporates its prior findings that Plaintiffs Drazen and Bennett (Class representatives) had standing to bring this class action and that the requirements of Fed. R. Civ. P. 23(a) and Fed. R. Civ. P. 23(b)(3) for certification of class actions were met. (Doc. 44; Doc. 49 (approving preliminarily the amended settlement class that removed Herrick as class representative because he lacked standing)). See e.g., Little, 691 F.3d at 1303-04 (summarizing the law governing class certification).

Accordingly, the Court certifies the Settlement Class as defined in the Settlement Agreement, as amended, which consists of the following:

(a) All persons within the United States to whom, from November 4, 2014 through December 31, 2016, Defendant placed a voice or text message call to their cellular telephone pursuant to an outbound campaign facilitated by the web-based software application used by 3Seventy, Inc., or the software programs and platforms that comprise the Cisco Unified Communications Manager.

(b) Excluded from the term "Settlement Class" are (1) the trial judges presiding over the Actions; (2) Defendant, as well as any parent, subsidiary, affiliate or control person of Defendant, and the officers, directors, agents, servants or employees of Defendant; (3) the immediate family of any such person(s); (4) any Settlement Class Member who timely and properly opts out of the settlement; and (5) Class Counsel, their employees, and their immediate family.

(Doc. 45-1 at 11).

## VI.    The Settlement Agreement

The Court now assesses whether to grant final approval to the Settlement Agreement. A class action can be certified "only with the court's approval" and only after class notice and a hearing. Fed. R. Civ. P. 23(e). Settlement is "generally favored because it conserves scarce judicial resources." In re Smith, 926 F.2d 1027, 1029 (11th Cir. 1991).

Before approving the settlement, the Court must analyze whether the Settlement Agreement is fair, adequate and reasonable and not the result of collusion. Greco v. Ginn Development, Co., LLC, 635 Fed. Appx. 628, 632 (11th Cir. 2015) (quoting Cotton v. Hinton, 559 F.2d 1326, 1330 (5th Cir. 1977)); Nelson v. Mead Johnson & Johnson Co., 484 Fed.Appx. 429, 434 (11th Cir. 2012) (same); Ault v. Walt Disney World Co., 692 F.3d 1212, 1217 (11th Cir. 2012) (accord); Fed. R. Civ. P. 23(e)(2). The Court of Appeals for the Eleventh Circuit has also identified six factors for the district courts to consider in making this assessment: "(1) the likelihood of success at trial; (2) the range of possible recovery; (3) the point on or below the range of possible recovery at which a settlement is fair, adequate and reasonable; (4) the complexity, expense and

duration of litigation; (5) the substance and amount of opposition to the settlement; and (6) the stage of proceedings at which the settlement was achieved." Greco, 635 Fed. Appx. at 632 (citing Bennett v. Behring Corp., 737 F.2d 982, 986 (11th Cir. 1984)).

A.    Collusion

First, the Settlement Agreement does not appear to be the product of collusion. The Settlement Agreement is the result of arm's length settlement negotiations and lengthy discussions. The parties participated in multiple mediations, following extensive and contentious discovery. The Honorable Wayne R. Anderson (Ret.) of JAMS Chicago assisted in one of these mediations. (Doc. 69-1 at 3). The Settlement Agreement resulted from months of negotiation and multiple months finalizing the ultimately agreed upon Settlement. See Camp v. City of Pelham, 2014 WL 1764919, at *4 (N.D. Ala. May 1, 2014) (finding there is no evidence of collusion where parties participated in multiple mediations and the settlement was the result of arm's length negotiations). And see Saccoccio v. JP Morgan Chase, N.A., 297 F.R.D. 683, 692 (S.D. Fla. 2014) ("Where the parties have negotiated at arm's length, the Court should find that the settlement is not the product of collusion."). And see Nelson, 484 Fed.Appx. at 435 (overruling an objection that contended in part that attorneys' fees provision indicated collusion because settlement agreement was the result of extensive arms-length negotiations moderated by a court-appointed mediator). Accordingly, the Court finds that this factor weighs in favor of approving the Settlement Agreement.

B.    Opinion of Counsel

"In considering the settlement, the district court may rely upon the judgment of experienced counsel for the parties." Nelson v. Mead Johnson & Johnson Co., 484 Fed. Appx. 429, 434 (11th Cir. 2012) (citing Cotton, 559 F.2d at 1330. Thus, "[a]bsent fraud, collusion, or the like, the district court 'should be hesitant to substitute its own judgment for that of counsel.'" Id. And see Greco,

635 Fed.Appx. at 632 (same). At the Final Approval Hearing, counsel for the parties indicated the Settlement Agreement was a fair, reasonable, and adequate settlement, particularly in light of the unsettled nature of TCPA litigation. The parties were represented by skilled and experienced counsel, many of whom are experienced in class action litigation specifically. Accordingly, the Court finds that this factor weighs in favor of approving the Settlement Agreement.

        C.      Likelihood of Success at Trial

Plaintiffs' likelihood of success at trial is not only the first Bennett factor, it is also "by far the most important factor" in evaluating a class action settlement. Hanley v. Tampa Bay Sports and Entertainment, LLC, 2020 WL 2517766, at *4 (M.D. Fla. Apr. 23, 2020) (quoting Figueroa v. Sharper Image Corp, 517 F.Supp.2d 1292, 1323 (S.D. Fla. 2007). And see Gonzalez v. TCR Sports Broadcasting Holding, LLP, 2019 WL 2249941, at *4 (S.D. Fla. May 24, 2019) (same). "Plaintiff's likelihood of success at trial is 'weighed against the amount and form of relief contained in the settlement.'" Morgan v. Public Storage, 301 F.Supp.3d 1237, 1249 (S.D. Fla. 2016) (quoting Saccoccio, 297 F.R.D. at 692). And see Figueroa, 517 F.Supp. at 1323 (citing Lipuma v. Am. Express Co., 406 F. Supp. 2d 1298, 1319 (S.D. Fla. 2005) (same)).

Here, Plaintiffs faced substantial hurdles that affected the class's likelihood of succeeding on the merits at trial. Plaintiffs allege that GoDaddy violated the TCPA when it called and texted unwanted marketing messages. Moreover, as discussed *supra,* the case law surrounding TCPA litigation is unsettled rendering the chance for success at trial similarly uncertain. For example, one open question concerns whether the technology GoDaddy used constitutes an ATDS under the TCPA. "In fact, a recent opinion by the Eleventh Circuit Court of Appeals has suggested a narrow interpretation of what constitutes an ATDS, thus limiting Plaintiff's ability to demonstrate that [GoDaddy] utilized such equipment." Hanley, 2020 WL 251776, at *4 (citing Glasser v.

Hilton Grand Vacations Co., LLC, 948 F. 3d 1301 (11th Cir. 2020) and Northrup v. Innov. Health Ins. Partners, LLC, No. 8:17-cv-1890-T-36JSS, 2020 WL 906199 (M.D. Fla. Feb. 25, 2020)). Also, there are numerous splits between the circuits in TCPA actions such as whether receipt of a single text message establishes a concrete injury in fact. Compare Cordoba v. DirecTV, LLC, 942 F.3d 1259, 1270 (11th Cir. 2019) and Glasser v. Hilton Grand Vacations Co., 948 F.3d 1301, 1306 (11th Cir. 2020) (affirming the holding in *Salcedo v. Hanna*) *with* Van Patten v. Vertical Fitness Group, 847 F.3d 1037 (9th Cir. 2017) and Melito v. Experian Marketing Solutions, Inc., 923 F.3d 85 (2d Cir. 2019).

Not only are there attendant risks with proceeding to trial amidst an unsettled and quickly changing backdrop, continued litigation would have involved substantial expense and delay. "The uncertain path to recovery suggests that the settlement agreement may represent the better alternative for Plaintiff[s] and the class." Hanley,  2020 WL 251776, at *4. And see Jairam v. Colourpop Cosmetics, LLC, 2020 WL 5848620, at *6 (S.D. Fla. Oct. 1, 2020) (citing Bennett v. Behring Corp., 96 F.R.D. 343, 349-50 (S.D. Fla. 1982), *aff'd*, 737 F.2d 982 (11th Cir. 1984) (plaintiffs faced a "myriad of factual and legal problems" creating "great uncertainty as to the fact and amount of damage," making it "unwise [for plaintiffs] to risk the substantial benefits which the settlement confers ... to the vagaries of a trial")).

The Settlement Agreement established a common fund of $35,000,000, which funds the claims filed by the Class Members. Each Class Member will receive "the full $35 Cash Award or $150 Voucher Award as they elected." There is value in the finality of this settlement, particularly against the evolving landscape of TCPA cases which have not been favorable to plaintiffs. As the parties indicated at the Final Approval Hearing, GoDaddy's bargaining position has strengthened since this settlement was reached because of developments in TCPA law. Thus, the benefit

provided to the Settlement Class may even be less had this Settlement Agreement been negotiated today. Accordingly, the Court finds that this factor weighs in favor of approving the Settlement Agreement.

D.   The Range of Possible Recovery and the Point on or Below the Range of Possible Recovery at which a settlement is fair, adequate, and reasonable

"The second and third considerations of the *Bennett* test are easily combined. A court first determines the possible range of recovery by resolving various damages issues. The court then determines where in this range of possible recovery do fair, adequate, and reasonable settlements lie." Gonzalez, 2019 WL 2249941, at *4 (citing Behrens v. Wometco Enterprises, Inc., 118 F.R.D. 534, 541 (S.D. Fla. 1988)). In determining whether the Settlement Agreement is fair in comparison to the possible range of recovery, the Court notes that "the fact that a proposed settlement amounts to only a fraction of the potential recovery does not mean the settlement is unfair or inadequate…The instant Settlement must be evaluated in light of the attendant risks with litigation" Jairam v. Colourpop Cosmetics, LLC, 2020 WL 5848620, at *6 (internal citations omitted).[7] "The range of possible recovery spans from a finding of non-liability to a varying range of monetary and injunctive relief. In considering the question of a possible recovery, the focus is on the possible recovery at trial." Saccoccio, 297 F.R.D. at 693 (internal quotations and citations omitted). "A settlement can be satisfying even if it amounts to a hundredth or even a thousandth of a single percent of the potential recovery." Behrens, 118 F.R.D. at 542.

Here, the Court finds the Settlement Agreement provides a fair and reasonable recovery to the Class Members. Each Class Member who opted to participate and submit a claim will receive

---

[7] The TCPA provides statutory damages for the "actual monetary loss" resulting from the violation or "500.00 in damages for each violation, whichever is greater." 47 U.S.C. § 227(b)(3)(B). The TCPA also provides for treble damages for each violation, $1,500.00. "[i]f the court finds that the defendant willfully or knowingly" violated the TCPA. 47 U.S.C. § 227(b)(3).

either a $35 Cash Award or a $150 Voucher, whichever they selected. While recovery achieved here does not achieve full recovery ($500 per call/text), the Settlement is a fair and reasonable result when considering GoDaddy's defenses and the challenging, unpredictable path of litigation Plaintiffs would have to face in this court and in appellate courts. See e.g., Jairam, 2020 WL 5848620 at *7 (approving settlement that awarded $11.25 to each Settlement Class Member who opted in); Williams v. Bluestem Brands, Inc., 2019 WL 1450090, at *2 (M.D. Fla. Apr. 2, 2019) (collecting cases about typical awards in TCPA cases, finding potential awards between $25-$75 to be typical). And see Spillman v. RPM Pizza, LLC, 2013 WL 2286076, at *4 (M.D. La. May 23, 2013) ("the 314,231 members of the Monetary sub-class will receive up to a $15 cash payment"); Hashw v. Dep't Stores Nat'l Bank, 182 F.Supp.3d 935, 944 (D. Minn. 2016) (approving a TCPA settlement that yielded $33.20 per claimant); In re Capital One TCPA Litig., 80 F.Supp.3d 781, 790 (N.D. Ill. 2015) (approving a TCPA settlement that yielded $34.60 per claimant). Accordingly, the Court finds this factor weighs in favor of approval.

### E.   The Complexity, Expense, and Duration of Litigation

"A settlement that 'will alleviate the need for judicial exploration of ... complex subjects, reduce litigation costs, and eliminate the significant risk that individual claimants might recover nothing' merits approval." Swaney v. Regions Bank, 2020 WL 3064945, at *4 (N.D. Ala. June 9, 2020) (citing Lipuma, 406 F.Supp.2d at 1324). In order for a national class action like this case to be successful, it involves extensive discovery and expert involvement, contentious argument and voluminous briefing over certification, summary judgment, and *Daubert* challenges; a lengthy trial; and appeals. See Parsons v. Brighthouse Networks, LLC, 2015 WL 13629647, at *4 (N.D. Ala. Feb. 5, 2020). "The Court should consider the vagaries of litigation and compare the significance of immediate recovery by way of the compromise to the mere possibility of relief in

the future, after protracted and expensive litigation. In this respect, '[i]t has been held proper to take the bird in the hand instead of a prospective flock in the bush.'" Lipuma, 406 F.Supp.2d at 1323 (citing In re Shell Oil Refinery, 155 F.R.D. 552, 560 (E.D. La. 1993)).

As discussed *supra,* this case involved difficult substantive issues amidst a setting of developing case law. The chance of a successful recovery for the Class Members becomes even more uncertain had this case been prolonged through litigation. See e.g., Parsons v. Brighthouse Networks, LLC, 2015 WL 13629647, at *4 ("Given the nature of this case, any judgment at trial would likely be appealed by the losing party. As a result, continued litigation would have risked delaying the class's potential recovery for years, further reducing the value of any such recovery."). These considerations weigh in favor of approving the Settlement Agreement.

F.      The Substance and Amount of Opposition to the Settlement

"In assessing whether a proposed settlement is fair, adequate, and reasonable, the court must 'examine the settlement in light of the objections raised.'" Swaney, 2020 WL 3064945 at *5 (citing Cotton, 559 F.2d at 1331). "In assessing the fairness of a proposed compromise, the number of objectors is a factor to be considered but is not controlling." Cotton, 559 F.2d at 1331. "Thus, a low percentage of objections [may] point[ ] to the reasonableness of a proposed settlement and support[ ] its approval." Lipuma, 406 F. Supp. 2d at 1324 (citing Bennett, 737 F.2d at 986). And see Waters v. Cook's Pest Control, Inc., 2012 WL 2923542, at *13 (N.D. Ala. July 17, 2012) (same).

Here, as noted *supra*, of a final Settlement Class of 1,237,296, only 37,775 notices were known to be undeliverable. (Doc. 69-3 at 5, 8). Thus, notice was effective for 96.95% of the class. Of those members who received notice, only one timely and proper objection was filed.[8] And, as

_____

[8] The Court received a second objection that was stricken as untimely as it was filed more than two months after the objection deadline.

of October 22, 2020, Epiq had received only 11 opt-out requests (Doc. 69-3 at 9, 29). These "low opt-out and objection rates weighs in favor of granting final approval" of the Settlement. Burrow v. Forjas Taurus S.A., No. 16-cv-21606, 2019 WL 4247284, at *10 (S.D. Fla. Sept. 6, 2019); Berman v. General Motors LLC, 2019 WL 6163798, at *6 (S.D. Fla. Nov. 18, 2019) (finding 70 objections and 1,709 opt-outs out of 1,641,531 Class Members who received notice to be "low" and in favor of granting approval). See also Lipuma, 406 F.Supp.2d at 1324 ("In determining whether a proposed settlement is fair, reasonable and adequate, the reaction of the class is an important factor.").

The Court has considered Pinto's objections and arguments made in his written objection as well as his arguments made at the Final Approval Hearing. His objections generally include: 1) class notice violates due process; 2) premature order on attorneys' fees should be set aside; 3) this is a coupon settlement under CAFA; 4) the Court should disapprove the settlement under CAFA; 5) Attorneys' fees cannot be awarded under CAFA without knowing percent of vouchers actually redeemed; 6) if the Court uses the lodestar method for attorneys' fees, Class Counsel must submit further information; 7) Class Counsel are not entitled to a multiplier; 8) the Settlement should be disapproved under CAFA or excess attorneys' fees should be awarded to the class; 9) the Court should require additional efforts to ensure claimants receive benefits. (Doc. 53).

First, Pinto argued class notice violated due process and the order on attorneys' fees should be set aside because it preceded the objection deadline. The Court acknowledged its order on fees was premature; the Court amended its order on fees, making it a preliminary order and carrying the motion to the Final Approval Hearing for consideration now.  The Court reconsiders attorneys' fees herein.

Further, the Court heard arguments at the Final Approval Hearing, read the parties' briefs, and independently examined the applicability of CAFA's coupon settlement provisions to this case. As discussed *supra,* the Court disagrees with Pinto that this is a coupon settlement because the option of a cash award distinguishes this case from strictly coupon settlement cases. The bulk of Pinto's argument involves his argument that this is a coupon settlement and therefore the Court's analysis is cabined by the parameters set forth in CAFA. The Court's determination that this is not a coupon settlement therefore addresses and overrules multiple arguments Pinto asserts. Pinto's remaining arguments deal with the award of attorneys' fees which will be discussed *infra*, in Section VII.

G.    The Stage of Proceedings at which the Settlement was Achieved

"Courts look at this last factor 'to ensure that [p]laintiffs had access to sufficient information to adequately evaluate the merits of the case and weigh the benefits of settlement against further litigation.'" Swaney, 2020 WL 3064945 at *5 (citing Lipuma, 406 F.Supp.2d at 1324 and Mashburn v. Nat'l Healthcare, Inc., 684 F. Supp. 660, 669 (M.D. Ala. 1988) (holding that early settlements are to be encouraged, and accordingly, only some reasonable amount of discovery is required to determine the fairness of the settlement)).

This action was filed August 21, 2019 and the final Settlement Agreement was submitted May 28, 2020 but this case has been proceeding longer than this action shows. As discussed above, the Bennett Action was consolidated with the Drazen matter in February 2020. The Bennett Matter was originally filed June 20, 2016. (Docket No. 16-cv-3908 (D. Ariz.)). Plaintiffs state "[t]he negotiations that led to the settlement followed extended and contentious discovery. The first mediation in this litigation followed the close of discovery and the granting of Plaintiff Bennett's motion for class certification following full briefing." (Doc. 69 at 10). Then, "it took another three

months of negotiations for the Parties to finalize the Original Agreement, and yet another three months for the Parties to finalize the final Settlement Agreement that the Court ultimately preliminarily approved." (<u>Id.</u>). The parties had sufficient information to adequately assess the merits of the case and to weigh the benefits of settlement prior to entering into a settlement agreement. Under these circumstances, the stage of the proceedings at which settlement was achieved favor approving the Settlement Agreement. See <u>Hanley</u>, 2020 WL 2517766, at *5 (finding in favor of approving settlement where although parties settled relatively early on, the parties had sufficient information to assess the merits and weigh the benefits of settlement); <u>Gonzalez</u>, 2019 WL 2249941, at *5 (same).

H.     <u>Appointing Class Counsel</u>

"An order that certifies a class action must … appoint class counsel under Rule 23(g).…" Fed. R. Civ. P. 23(c)(1)(B). After consideration of the factors identified in Rule 23(g)(1)(A)[9] and for the reasons set forth in the Order granting preliminary approval of Class Counsel (Doc. 49 at 3), the Court affirms its prior conclusion that JRC Legal, McGuire Law, P.C., Underwood and Riemer, PC, Bock, Hatch, Lewis & Oppenheim, LLC, Mark K. Wasvary, P.C., Kent Law Offices, and McMorrow Law, P.C., are finally appointed as Class Counsel.

I.     <u>Conclusion</u>

For the reasons set forth herein, the Court approves the Settlement Agreement (Doc. 45-1) as fair, reasonable, and adequate and not the result of collusion. The Court expressly adopts and incorporates herein all of the terms of the amended Settlement Agreement. The Court authorizes

---

[9] "In appointing class counsel, the court: (A) must consider: (i) the work counsel has done in identifying or investigating potential claims in the action;(ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action;(iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class; (B) may consider any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class[.]" Fed. R. Civ. P. 23(g)(1)(A)&(B).

and directs implementation and performance of the terms and provisions of the Settlement Agreement, as well as the terms and provisions hereof.[10] The Parties to the Settlement Agreement shall carry out their respective obligations under the Settlement Agreement.

## VII. Plaintiffs' and Class Counsels' Motion and Memorandum for Award of Attorneys' Fees and Expenses

Also before the Court is Plaintiffs' Motion for Attorneys' Fees, Costs, Expenses, and for Service Awards (Doc. 50). The Court, having certified the Class Action and having approved the Settlement Agreement, turns to Plaintiffs' motion. Plaintiffs request $10,500,000.00 in attorneys' fees, and seek to recover $105,410.51 in expenses and costs. (Doc. 50 at 7). The Plaintiffs requested $5,000 service awards for each of the "lead Plaintiffs." (Id. at 8).

---

[10] Pinto also states in his objection "the settlement places little burden on the settlement administrator to ensure that the settlement benefits reach the class members." (Doc. 53 at 33). Pinto then asserts "[w]hen checks or vouchers are returned as undeliverable, the administrator need only verify the accuracy of the address and attempt a second mailing of appropriate… "No further efforts need to be taken…"" (Id. (quoting a portion of the Settlement Agreement)). Pinto suggests "[a]t the very least, the administrator should also be required to email claimants to confirm the accuracy of the address listed on the claim form and attempt a further mailing." (Id.).

Pinto removes the quoted language from context. The Settlement Agreement provides: "c. Within one hundred twenty (120) days after funds are deposited into the Settlement Account and vouchers containing redemption codes are provided by Defendant, the Settlement Administrator shall distribute Settlement Awards via U.S. mail to the addresses associated with the Approved Claims in the form of either (a) checks made payable to the Settlement Class Members or (b)  vouchers containing a redemption code, as applicable. If any Settlement Award payments or vouchers are returned as undeliverable, the Settlement Administrator shall attempt to verify the accuracy of the mailing address for that Settlement Class Member against the information provided in the Claim, and attempt a second mailing if appropriate. No further efforts need be taken by the Settlement Administrator to resend the check or voucher." (Doc. 45-1 at 25).

Plaintiffs respond that the Settlement Agreement does not limit the Settlement Administrator's duty to "verify the mailing information" and this duty could encompass the very solution Pinto suggests—sending a follow up email to confirm the mailing address. (Doc. 61 at 30). In fact, Grabowski, project manager for Epiq, states "Pursuant to Section 76 of the Settlement Agreement, if any Cash Awards or Vouchers Awards are returned as undeliverable, the Settlement Administrator shall attempt to verify the accuracy of the mailing address for those Settlement Class Members against the provided in the Claim, and attempt a second mailing if appropriate. To the extent that any Class Member had filed a USPS change of address request, and the address was certified and verified, the current address listed in the NCOA database will be used in connection with the Settlement Award mailing campaign. This address updating process is standard for the industry and for the majority of promotional mailings that occur today. Additionally, Epiq will conduct an email campaign to request updated U.S. mailing addresses from Settlement Class Members for all undeliverable Settlement Awards." (Doc. 61-2 at 5). The Court finds the process to ensure claimants receive their claimed awards to be reasonable and adequate; Pinto's objection as to same is overruled.

"The Supreme Court has acknowledged that '[a] litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole.'" In re Sunbeam Sec. Litig., 176 F. Supp. 2d 1323, 1333 (S.D. Fla. 2001) (citation omitted); Gevaerts v. TD Bank, N.A., No. 14-cv-20744, 2015 WL 6751061, at *10 (S.D. Fla. Nov. 5, 2015) (citing Camden I Condo Ass'n v. Dunkle, 946 F.2d 768, 771 (11th Cir. 1991) [*Camden I*]) ("It is well established that when a representative party has conferred a substantial benefit upon a class, counsel is entitled to attorneys' fees based upon the benefit obtained."). And see Gonzalez, 2019 WL 2249941 at *6 (awarding attorneys' fees from the common fund); Hanley, 2020 WL 2517766 at *5-6 (same); Swaney, 2020 WL 3064945 at *6-7 (accord). In *Camden I*, the Eleventh Circuit held that "the percentage of the fund approach [as opposed to the lodestar approach][11] is the better reasoned [approach] in a common fund case. Henceforth in this Circuit, attorneys' fees awarded from a common fund shall be based upon a reasonable percentage of the fund established for the benefit of the class." Gevaerts, 2015 WL 6751061 at *10 (quoting Camden I, 946 F.2d at 774). This is true "regardless of whether each class member redeems the benefits made available to the class members…" Swaney, 2020 WL 3064945 at *6. The Eleventh Circuit has also applied this percentage-based approach to "claims-made settlements," noting that a "claims-made settlement is ... the functional equivalent of a common fund settlement where the unclaimed funds revert to the defendant." Poertner v. Gillette Co., 618 Fed. Appx. 624, 628 n.2 (11th Cir. 2015). And see Waters v. Intern. Precious Metals Corp., 190 F.3d 1291, 1294-94 (11th Cir. 1999) (upholding an attorney fee award based on the entire settlement fund, even though a portion reverted to the defendant).

---

[11] This speaks in part to Pinto's objection that the lodestar method should be utilized to calculate fees here. The Eleventh Circuit does not use the Lodestar method in common fund cases. Thus, Pinto's objection as to same is overruled.

Courts have "substantial discretion in determining the appropriate fee percentage awarded to counsel." Gavaerts, 2015 WL 6751061, at *10. "There is no hard and fast rule mandating a certain percentage of a common fund which may be awarded as a fee because the amount of any fee must be determined upon the facts of each case." Camden I, 946 F.2d at 774. And see In re Sunbeam Sec. Litig., 176 F. Supp. 2d 1323, 1333 (S.D. Fla. 2001) (quoting same). "In this Circuit, courts typically award between 20-30%, known as the benchmark range." In re Home Depot, 931 F.3d 1065, 1076 (11th Cir. 2019). And see Swaney, 2020 WL 3064945 at *7 (collecting cases awarding attorneys' fees within this range).

Where a requested fee "exceeds 25 percent of the claims," this Circuit has historically encouraged courts to apply the factors set out in Johnson v. Georgia Highway Express, Inc., 488 F.2d 714, 717-19 (5th Cir. 1974), abrogated on other grounds by Blanchard v. Bergeron, 489 U.S. 87, 109 (1989) to determine the reasonableness of the requested fees in light of the outcome of the case. Faught v. American Home Shield Corp., 668 F.3d 1233, 1242 (11th Cir. 2011) (citation omitted); see Camden I, 946 F.2d at 775 ("[T]he Johnson factors continue to be appropriately used in evaluating, setting, and reviewing percentage fee awards in common fund cases."). The Johnson factors include:

> (1) the time and labor required; (2) the novelty and difficulty of the questions involved; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the 'undesirability' of the case; (11) the nature and the length of the professional relationship with the client; and (12) awards in similar cases.

Camden I, 946 F.2d at 772 n.3. "Other pertinent factors are the time required to reach a settlement, whether there are any substantial objections by class members or other parties to the settlement

terms or the fees requested by counsel, any non-monetary benefits conferred upon the class by the settlement, and the economics involved in prosecuting a class action." Camden I, 946 F.2d at 775.

Class Counsel's requested fee award here represents 30% of the Settlement Fund of $35,000,000. Because this requested fee award exceeds the 25% "benchmark," the Court analyzes the relevant Johnson factors.

The time and labor expended were considerable due to the multiple courts where litigation occurred. However, the issues in this case were not complex and did not entail more than the average skill required of litigation in federal court. And while the settlement involved significant time and effort, it is evident that based on the structure of the settlement (claims made fund) and the typical claims rate in consumer cases, that no party expected recovery for plaintiffs of $35 million. And, while it is appropriate to base attorney fees on the common fund amount of $35 million, it cannot be ignored that this is an exaggerated "result" for the plaintiffs.

However, the Court has also considered that the evolution of the law in the area of TCPA litigation has been unfavorable to plaintiffs. The Settlement Agreement here represents a very favorable outcome for Settlement Class Members, given that the Plaintiffs likelihood of success on the merits is changing constantly. However, the results obtained for the plaintiffs do not justify an award at the high end of the benchmark.

The Court also considered Pinto's objections to the requested fee. Pinto argues attorneys' fees are too high because Class Counsel's requests fee would be 2.5 times the class's recovery. Pinto bases this ratio on a calculation of the value of estimated redeemed coupons and cash payout compared to the requested fees. But because this is not a coupon settlement, CAFA's provisions that base attorneys' fee awards on coupons actually redeemed is inapplicable. As discussed *supra*, the law in this Circuit awards attorneys' fees based on a common fund notwithstanding the realized

payout. And, to the extent Pinto is asserting the attorneys' fee request indicates collusion, the agreement here was reached after arms-length negotiations facilitated by a respected retired judge. See Nelson, 484 Fed.Appx. at 435 (overruling an objection that contended in part that attorneys' fees provision indicated collusion where the court found the settlement agreement was the result of extensive arms-length negotiations moderated by a court-appointed mediator).

After reconsideration, the Court concludes that a reasonable fee for Class Counsel is 20%. Thus, the Court will approve attorneys' fees totaling 20% of the Settlement Fund, $7,000,000. Accordingly, Plaintiffs' motion as to attorneys' fees (Doc. 50) is granted in part and denied in part. Pinto's objections as to attorneys' fees are overruled.

A.    Costs and Expenses

Class Counsel seeks reimbursement of $105,410.51 for costs incurred. (Doc. 50 at 7). Courts typically allow counsel to recover their reasonable out-of-pocket expenses. Indeed, courts routinely grant expense requests in common fund cases as a matter of course. See Flaum v. Doctor's Assoc., Inc., 2019 WL 2576361 (S.D. Fla. March 11, 2019) (approving costs to Class Counsel); Waters, 190 F.3d at 1298 ("Upon submission of adequate documentation, plaintiffs' attorneys are entitled to reimbursement of those reasonable and necessary out-of-pocket expenses incurred in the course of activities that benefitted the class."); Morgan, 301 F.Supp.3d at 1258 (same).

Class Counsel submitted documentation of their costs and expenses which included costs "related to filing fees, travel expenses, copying, mediation fees, and case administration with the potential of more expenses yet to come." (Doc. 50 at 26). GoDaddy also agreed not to oppose Plaintiffs' request for "reimbursement of reasonable, documented litigation costs and expenses." (Doc. 45-1 at 26). The Court has reviewed Class Counsel's attached declarations regarding fees

and finds that Class Counsel's costs and expenses were reasonably incurred. Accordingly, Plaintiffs' motion as to costs and expenses (Doc. 50) is due to be granted.

      B.    <u>Incentive Awards to the Class Representatives</u>

Plaintiffs moved for the "agreed-upon service awards for the lead plaintiffs" (amounting to $5,000 per "lead plaintiff") in its motion for attorneys' fees and expenses. (Doc. 50 at 27). Subsequent to filing their motion for fees, the Court *sua sponte* asked the parties to address the impact of the Eleventh Circuit's opinion in <u>Johnson v. NPAS Solutions, LLC,</u> 975 F.3d 1244 (11th Cir. 2020). (Doc. 60). As <u>Johnson</u> makes clear, and as all parties agree, the Court can not approve the request for Service Awards for the Plaintiffs. (Docs. 66, 67, 68 (all agreeing service awards should not be approved)); <u>Johnson,</u> 975 F.3d at 1244. The Eleventh Circuit recently held that "[a] plaintiff suing on behalf of a class can be reimbursed for attorneys' fees and expenses incurred in carrying on the litigation, but he cannot be paid a salary or be reimbursed for his personal expenses." <u>Johnson,</u> 975 F.3d at 1257. In doing so, the Eleventh Circuit interpreted a pair of Supreme Court cases from the 1880s to hold that "incentive" or "service" awards to lead plaintiffs in Rule 23 class actions are unlawful. See <u>Central Railroad & Banking Co. v. Pettus,</u> 113 U.S. 116 (1885); <u>Trustees v. Greenough,</u> 105 U.S. 527 (1882). Accordingly, in light of <u>Johnson</u>, the Court hereby denies approval of the requested Service Awards. (Doc. 50).

      E.    <u>Conclusion</u>

Upon consideration, the Court finds that 20% of the Settlement Fund ($7,000,000) is reasonable and in line with Eleventh Circuit precedent. The Court also finds that Plaintiffs are entitled to costs in the amount of $105,410.51. These amounts are to be paid in accordance with the provisions of the Settlement Agreement, adopted herewith.

**VIII.**  **<u>Release</u>**

In class action settlements, the release "may include all claims that arise out of the same course of conduct alleged in the Complaint, known and unknown claims, or even claims over which the court lacked jurisdiction." Faught v. Am. Home Shield Corp., 2010 WL 10959223, at *15 (N.D. Ala. Apr. 27, 2010), aff'd, 668 F.3d 1233 (11th Cir. 2011) (citations omitted); see also Thomas v. Blue Cross & Blue Shield Ass'n, 333 F. App'x 414, 420 (11th Cir. 2009) ("Given a broad enough settlement agreement ... and provided that [a class member] had notice of it and an opportunity to opt out, it is perfectly acceptable for the [settling class] action to preclude his claims, even if they could not have been part of that action itself."). To that end, the Settlement Agreement contains a broadly worded, nationwide and class-wide release provision, which sets forth as follows:

> 79. Upon the Effective Date, the Releasing Parties[12] shall automatically be deemed to have fully and irrevocably released and forever discharged Defendant and the Released Parties[13] from any and all liabilities, rights, claims, actions, causes of action, demands, damages, costs, attorneys' fees, losses, and remedies, whether known or unknown, existing or potential, suspected or unsuspected, liquidated or unliquidated, legal, statutory, or equitable, that result from, arise out of, are based upon, or relate to the Actions, or the conduct, omissions, duties or matters at any time from the beginning of the Class Period through the end of the Class Period that were or could have been claimed, raised, or alleged in the Actions.
>
> 80. The Parties understand and acknowledge that this Agreement constitutes a compromise and settlement of disputed claims. No action taken by the Parties either previously or in connection with the negotiations or proceedings connected with this Agreement shall be deemed or construed to be an admission of the truth or falsity of any claims or defenses heretofore made, or an acknowledgment or admission by any party of any fault, liability or wrongdoing of any kind whatsoever.

---

[12] Releasing Parties is defined in the Settlement Agreement as: "Releasing Parties" shall mean Plaintiffs and all Settlement Class Members who do not timely and properly opt-out of the Agreement, and each of their respective executors, representatives, heirs, predecessors, assigns, beneficiaries, successors, bankruptcy trustees, guardians, joint tenants, tenants in common, tenants by the entireties, agents, attorneys, representatives and all those who claim through them or on their behalf. (Doc. 45-1 at 9).

[13] Released Parties is defined in the Settlement Agreement as: "Released Parties" shall mean, jointly and severally, and individually and collectively, Defendant and its past and present parents, predecessors, successors, affiliates, holding companies, subsidiaries, employees, agents, attorneys, board members, assigns, partners, contractors, joint venturers, or third-party agents with which it has or had contracts, and/or their affiliates. (Doc. 45-1 at 9).

81. Neither the Agreement, nor any act performed or document executed pursuant to or in furtherance of the Agreement: (a) is or may be deemed to be, or may be used as, an admission of, or evidence of, the validity of any claim made by the Plaintiffs or Settlement Class Members, or any wrongdoing or liability on the part of the Released Parties; or (b) is or may be deemed to be, or may be used as, an admission of, or evidence of, any fault or omission on the part of any of the Released Parties, in the Actions, or in any proceeding in any court, administrative agency or other tribunal.

82. In addition, with respect to the subject matter of this Actions, by operation of the entry of the Final Approval Order, Plaintiffs and each Settlement Class Member, and each of their respective successors, assigns, legatees, heirs, and personal representatives, expressly waive any and all rights or benefits they may now have, or in the future may have, under any law relating to the releases of unknown claims, including, without limitation, Section 1542 of the California Civil Code, which provides:

> A General Release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor.

By operation of the entry of the Final Approval Order, Plaintiffs and each Settlement Class Member, shall be deemed to have waived any and all provisions, rights, and benefits conferred by any law of any state or territory of the United States or any foreign country, and any and all principles of common law that are similar, comparable, or equivalent in substance or intent to Section 1542 of the California Civil Code.

83. To the extent permitted by law, this Agreement may be pleaded as a full and complete defense to, and may be used as the basis for an injunction against, any action, suit, or other proceeding that may be instituted, prosecuted, or attempted in breach of or contrary to this Agreement.

(Doc. 45-1 at 26-28).

A release that is too narrow would leave future defendants little incentive to settle class action lawsuit. Release provisions are typically preconditions to defendants agreeing to settle. Here, Class members who wish to retain their claims and except themselves from the Settlement Agreement were given the opportunity to do so by opting out. As noted above, as of October 22, 2020, Epiq had received eleven timely opt-out requests. The Court finds that the release provision

"properly settles all matters between the class members and released parties" as a result of the GoDaddy's conduct as identified in the Settlement Agreement, that the release covers "claims based on the same factual predicate as the litigation being settled" and "is tailored to prevent the relitigation of settled questions at the core of this class action." <u>Greco</u>, 635 Fed. Appx. 628, 635–36 (11th Cir. 2015) (citing <u>In re Corrugated Container Antitrust Litig.</u>, 643 F.2d 195, 221 (5th Cir. 1981) (for the premise that the federal court "may release not only those claims alleged in the complaint and before the court, but also claims which could have been alleged by reason of or in connection with any matter or fact set forth or referred to in the complaint")). Accordingly, the Court approves the Release provision as set forth in the Settlement Agreement.

## IX.    <u>Conclusion</u>

Upon consideration of the foregoing, it is **ORDERED**, **ADJUDGED**, and **DECREED**, as follows:

(1) The Plaintiffs' Motion for Final Approval of Class Action Settlement (Doc. 69) is **GRANTED.**

(2) Plaintiffs' Motion for Attorneys' Fees, Costs, Expenses, and Service Awards (Doc. 50) is **GRANTED in part** and **DENIED in part** as detailed herein.

(3) The Court approves the Class Action Settlement as fair, reasonable, adequate and not the result of collusion.

(4) In light of the above findings, and solely for the purposes of the Settlement, the Court **CERTIFIES** this Action as a class action pursuant to Federal Rules of Civil Procedure 23(b)(3).

(5) Juan Pinto's Objection (Doc. 53) is **OVERRULED.**

(6) Those individuals deemed to have timely and validly requested exclusion from the Settlement Class and the Settlement Agreement are excluded. Records of their exclusions shall be maintained by the Settlement Administrator and Class Counsel.

(7) The Court expressly adopts and incorporates herein all of the terms of the Settlement Agreement and authorizes and directs implementation and performance of all the terms and provisions of the Settlement Agreement, as well as the terms and provisions hereof. The Parties to the Settlement Agreement shall carry out their respective obligations under that Agreement.

(8) This action is **DISMISSED with prejudice**.

(9) The Court retains jurisdiction over this Class Action Settlement.

**DONE** and **ORDERED** this the **23rd** day of **December 2020**.

/s/ Kristi K. DuBose
**KRISTI K. DuBOSE**
**CHIEF UNITED STATES DISTRICT JUDGE**